UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

RENAISSANCE/THE PARK, LLC d/b/a                                          Plaintiff
RENAISSANCE FUN PARK

v.                                                                           Civil Action No. 3:20-CV-864-RGJ

THE CINCINNATI INSURANCE                                                 Defendant
COMPANY

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

Defendant Cincinnati Insurance Company moves to dismiss Plaintiff Renaissance Fun Park's complaint. [DE 11]. Plaintiff moved for oral argument on Defendant's motion to dismiss. [DE 23]. Plaintiff then moved to file a sur-reply to Defendant's motion to dismiss. [DE 25]. Defendant filed three motions for leave to file supplemental authority. [DE 28; DE 29; DE 32]. Plaintiff filed two motions for leave to file supplemental authority, [DE 30; DE 31], and a motion for the Court to take judicial notice of an insurance policy Defendant issued to a different plaintiff in a different lawsuit in a different federal district. [DE 35]. Briefing is complete [DE 19; DE 22; DE 24; DE 26; DE 33; DE 34; DE 36] and these matters are ripe. For the reasons below, the Court **GRANTS** Defendant's Motion to Dismiss [DE 11], **DENIES** Plaintiff's Motion for Oral Argument [DE 23], **GRANTS** Plaintiff's Motion For Leave to File Sur-Reply [DE 25], **GRANTS** Defendant's Motions For Leave to File Supplemental Authority [DE 28; DE 29; DE 32], **GRANTS** Plaintiff's Motions to File Supplemental Authority [DE 30; DE 31], and **GRANTS** Plaintiff's First Motion for Judicial Notice [DE 35].

## I.    BACKGROUND

In March 2020, Kentucky officials issued several orders (the "March Orders") to slow the spread of the COVID-19 virus in Kentucky. [DE 1-2 at 16-17]. Plaintiff, a "recreational facility," "offers to the public-at-large, year-around, Go-Kart, Laser Tag, Mini Golf, and Arcade activities, along with food and drink service." *Id.* at 10. As a result of the March Orders, Plaintiff "suspen[ded]" its "operations." *Id.* at 17. Plaintiff alleges that the March Orders caused it to "los[e] substantial Business Income" and "prohibit[ed] . . . access" to its facility. *Id.*

In June 2020, Plaintiff resumed operations. *Id.* Yet, in mid-November, Governor Andy Beshear signed an executive order (the "November Order") "mandating that all indoor food and beverage cease. In addition, indoor social gatherings are limited to a maximum of two households and eight people, indoor recreation facilities to 33% of occupancy and six feet of space between people, and indoor venues limited to 25 people." *Id.* at 17-18. Plaintiff alleges that the November Order caused "a further substantial loss of Business Income" because it could not "offer food and beverages indoor" and could not use its "laser tag facility as it requires virtual darkness resulting in the inability of participants to remain six feet apart." *Id.* at 18.

Plaintiff held an insurance policy (the "Policy") from Defendant. *Id.* at 10. The Policy covered Plaintiff's recreational facility. *Id.* at 11. Defendant issued the Policy to Plaintiff on July 30, 2018 with coverage ending on July 30, 2021. *Id.* Plaintiff filed an insurance claim with Defendant for losses it suffered from COVID-19 and the March Orders and November Order (collectively, the "Orders"). *Id.* at 18. After Defendant denied Plaintiff's claim, Plaintiff filed suit in Jefferson County Circuit Court. [DE 1-2]. Defendant timely removed the case to this Court. [DE 1]. Plaintiff requests declaratory judgment against Defendant and asserts multiple state-law claims of breach of contract. [DE 1-2 at 18-23].

## II. DISCUSSION

### A. Jurisdiction

Plaintiff brings this action under the Declaratory Judgment Act. [DE 1-2 at 18]. While the Act authorizes district courts to exercise jurisdiction, it does not mandate or impose a duty to do so. *Bituminous Cas. Corp. v. J & L Lumber Co., Inc.*, 373 F.3d 807, 812 (6th Cir. 2004). While neither party has addressed the Court's jurisdiction, the Court will first determine whether the exercise of jurisdiction is appropriate under the circumstances of this case before addressing Defendant's motion to dismiss. *See Berkley Assurance Co. v. Carter Douglas Co., LLC*, No. 1:18-CV-00099-GNS, 2020 WL 201051, at *1 (W.D. Ky. Jan. 13, 2020) ("Although the issue has not been raised, courts are encouraged to, sua sponte, examine the issue of whether to exercise their discretion in asserting jurisdiction over actions brought pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a)").

The court considers five factors ("*Grand Trunk* factors") to determine whether the exercise of Declaratory Judgment Act jurisdiction is proper. *Grand Trunk W.R.R. Co. v. Consol. Rail Co.*, 746 F.2d 323, 326 (6th Cir. 1984) (internal quotation marks omitted). Although the Court must balance the five factors, the Sixth Circuit has never clarified the relative weights of the factors. *Id.* at 326.

The first two *Grand Trunk* factors assess "(1) whether the declaratory action would settle the controversy" and "(2) whether the declaratory action would serve a useful purpose in clarifying the legal relations in issue." *Grand Trunk*, 746 F.2d at 326. Because "it is almost always the case that if a declaratory judgment will settle the controversy, . . . it will clarify the legal relations in issue," the inquiries required by these two factors often overlap substantially. *United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 397 (6th Cir. 2019) (citing *Scottsdale Ins. Co. v.*

*Flowers*, 513 F.3d 546, 557 (6th Cir. 2008); *Bituminous*, 373 F.3d at 814; and *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454 (6th Cir. 2003)).

There are two lines of cases in the Sixth Circuit. *United Specialty Ins. Co. v. Cole's Place, Inc.*, No. 3:17-CV-00326-TBR, 2018 WL 1914731, at *4 (W.D. Ky. Apr. 23, 2018), *aff'd*, 936 F.3d 386 (6th Cir. 2019) (citing *Flowers*, 513 F.3d at 555). "One line of cases approved of declaratory actions because they can 'settle the insurance coverage controversy,' while a second line of cases disapproved of declaratory actions because while they 'might clarify the legal relationship between the insurer and the insured, they do not settle the ultimate controversy.'" *Id*. (quoting *Flowers*, 513 F.3d at 555).

This action falls into the first line of cases. The parties dispute whether the Policy covers damages arising from Plaintiffs' alleged inability to fully operate during the COVID-19 pandemic. There are no fact-bound issues of state law awaiting resolution in the state-court litigation. *See Bituminous*, 373 F.3d at 813–14. As a result, this declaratory judgment action will "settle the controversy," as it resolves the dispute between the insurer and insured over coverage. *See, e.g.*, *W. World Ins. Co. v. Hoey*, 773 F.3d 755, 760–61 (6th Cir. 2014). The first two *Grand Trunk* factors therefore support the exercise of jurisdiction.

The third factor considers "whether the use of the declaratory judgment action is motivated by 'procedural fencing' or [is] likely to create a race for res judicata." *Flowers*, 513 F.3d at 558. Based on the parties' pleadings, there is no competing state court declaratory action. Thus, the third *Grand Trunk* factor supports the exercise of jurisdiction.

The fourth *Grand Trunk* factor addresses "whether accepting jurisdiction would increase friction between federal and state courts" and is broken into three sub-parts. *Flowers*, at 559. The first sub-part "focuses on whether the state court's resolution of the factual issues in the case is

4

necessary for the district court's resolution of the declaratory judgment action." *Flowers*, 513 F.3d at 560. Here, any factual determinations the Court may have to make will not overlap with those in a state court action because there is no state court action pending. As a result, this sub-part supports exercising jurisdiction.

The second sub-part examines "which court, federal or state, is in a better position to resolve the issues in the declaratory action." *Id*. The Sixth Circuit has "found that 'issues of insurance contract interpretation are questions of state law with which the Kentucky state courts are more familiar and, therefore, better able to resolve.'" *Id.* at 561 (quoting *Travelers Indem. Co. v Bowling Green Prof. Assoc.*, 495 F.3d 266, 273 (6th Cir. 2007)). The questions that would arise here do not, however, involve novel issues of Kentucky law. The novel factor of the COVID-19 pandemic does not make this action inappropriate for this Court to consider because it involves application of well-established Kentucky principles of insurance policy interpretation. *See Cole's Place, Inc.*, 2018 WL 1914731 at *8. The second sub-part therefore is neutral.

The third sub-part "focuses on whether the issue in this federal action implicates important state policies and is, thus, more appropriately considered in state court." *Flowers*, 513 F.3d at 561. Kentucky state courts are "more familiar and, therefore, better able to resolve" interpretation of insurance contracts. *Id*. Even when the state law is not difficult to apply, the Sixth Circuit has usually found "that the interpretation of insurance contracts is closely entwined with state public policy." *Cole's Place, Inc.*, 936 F.3d at 401, citing *e.g.*, *Flowers*, 513 F.3d at 561 and *Travelers*, 495 F.3d at 273. Because this action involves the application of Kentucky law to an insurance contract, the third sub-part counsels against exercising jurisdiction.

The fifth and final factor asks "whether there is an alternative remedy which is better or more effective" than federal declaratory relief. *Grand Trunk*, 746 F.2d at 326. Kentucky law

provides a declaration of rights procedure under KRS § 418.040. *Mass. Bay Ins. Co. v. Christian Funeral Dirs., Inc.*, No. 18-5267, 2018 WL 6787945, at *8 (6th Cir. Dec. 26, 2018). The Sixth Circuit has held that, "[i]n many ways, this alternative would have been better." *Flowers*, 513 F.3d at 562. Specifically, "[t]he Kentucky courts are in a superior position to resolve undecided questions of state law," and "Kentucky courts might also have been able to combine the two actions so that all issues could be resolved by the same judge." *Id.* For these reasons, overall, the fifth *Grand Trunk* factor weighs against exercising jurisdiction.

As noted above, the Sixth Circuit has never suggested the relative weight of the factors; instead, "[t]he relative weight of the underlying considerations of efficiency, fairness, and federalism will depend on facts of the case." *Cole's Place, Inc.*, 936 F.3d at 402 (citing *Hoey*, 773 F.3d at 759). Further, "[t]he essential question is always whether [the court] has taken a good look at the issue and engaged in a reasoned analysis of whether issuing a declaration would be useful and fair." *Id.* (citing *Hoey,* 773 F.3d at 759) (citation omitted). Having evaluated those factors, the first three factors support exercising jurisdiction, as does one of the sub-factors of the fourth factor. Because of the importance of these factors, the exercise of the Court's discretionary jurisdiction is appropriate.

**B. Motion to Dismiss**

Federal Rule of Civil Procedure 12(b)(6) instructs that a court must dismiss a complaint if the complaint "fail[s] to state a claim upon which relief can be granted[.]" Fed. R. Civ. P. 12(b)(6). To state a claim, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). When considering a motion to dismiss, courts must presume all factual allegations in the complaint to be true and make all reasonable inferences in favor of the non-moving party. *Total Benefits Plan. Agency, Inc. v. Anthem Blue*

6

*Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008) (citation omitted). "But the district court need not accept a bare assertion of legal conclusions." *Tackett v. M & G Polymers*, USA, LLC, 561 F.3d 478, 488 (6th Cir. 2009) (citation omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). "A complaint will be dismissed . . . if no law supports the claims made, if the facts alleged are insufficient to state a claim, or if the face of the complaint presents an insurmountable bar to relief." *Southfield Educ. Ass'n v. Southfield Bd. of Educ.*, 570 F. App'x 485, 487 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 561–64).

The parties agree that Kentucky law governs the Policy. [DE 11-1 at 151; DE 19 at 220]. To determine whether coverage exists, the Court begins by interpreting the relevant insurance contract. *Stone v. Ky. Farm Bureau Mut. Ins. Co.,* 34 S.W.3d 809, 810 (Ky. Ct. App. 2000). "The primary object in construing a contract . . . is to effectuate the intentions of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.,* 94 S.W.3d 381, 384 (Ky. Ct. App. 2002). The Court discerns parties' intentions from the four corners of the contract. *Id.* Without ambiguities, the Court enforces the terms as written. *McMullin v. McMullin,* 338 S.W.3d 315, 320 (Ky. Ct. App. 2011) (citing *Whitlow v. Whitlow,* 267 S.W.2d 739, 740 (Ky. 1954)).

"A contractual provision is ambiguous if the provision is susceptible to multiple or inconsistent interpretations." *McMullin,* 338 S.W.3d at 320. Contractual terms are assigned their ordinary meaning, *Frear v. P. T.A. Indus., Inc.,* 103 S .W.3d 99, 106 (Ky. 2003), and courts are "simply unwilling to torture words to import ambiguity into a contract where the ordinary meaning leaves no room for ambiguity." *First Home, LLC v. Crown Communications, Inc.,* No.2010–CA–001701–MR, 2012 WL 95560 at *5 (Ky. Ct. App. Mar. 15, 2012). That said, the contract should be liberally construed and all ambiguous terms resolved in favor of the insured. *Ky. Farm Bureau Mut. Ins. Co. v. McKinney,* 831 S.W.2d 164, 166 (Ky. 1992).

Plaintiff asserts that the Policy provides coverage for its losses related to the COVID-19 pandemic and the Orders under the Policy's Business Income and Civil Authority provisions. [DE 19 at 221, 239]. Defendant contends that, as a matter of law, neither one of these provisions provides coverage for Plaintiff's alleged losses. [DE 22 at 431, 445].

1. <u>Business Income</u>

Under the Policy, Defendant "will pay for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." [DE 1-2 at 50]. "Covered Cause[] of Loss" means "direct 'loss' unless the 'loss' is excluded or limited in this Coverage Part." *Id.* at 52. "Loss" means "accidental physical loss or accidental physical damage." *Id.* at 85. The Policy does not define the phrase "accidental physical loss or accidental physical damage."

Defendant argues that "physical loss" and "physical damage" require "physical alteration," and that Plaintiff has failed to plausibly allege "physical alteration" in its Complaint:

> Plaintiff does not allege facts showing any direct physical loss to its property. Instead, it asserts a series of summary allegations and legal conclusions, devoid of factual support.

8

> . . .
>
> Rather than support Plaintiff's claim, Plaintiff's allegations only highlight the very reason why it does not allege that it is entitled to coverage under the Policy: COVID-19 does not cause physical loss to property. It hurts people. So too, the Orders do not cause physical loss to property. They were intended to keep people safe by keeping them separated.

[DE 11-1 at 152-53].

As an initial matter, the Court considers the meaning of the word "accidental." Although not addressed by either party, it is necessary for the Court to do so because the Policy provides coverage only if the "physical loss" or "physical damage" is "accidental." Although "accidental" is not defined by the Policy, the Kentucky Supreme Court has interpreted its meaning in the context of an insurance policy:

> The words "accident", "accidental", and "accidental means", as used in insurance policies, have never acquired a technical meaning in law, and must be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured. *Donohue v. Washington Nat. Ins. Co.,* 259 Ky. 611, 82 S.W.2d 780 (1935). An accident is generally understood as an unfortunate consequence which befalls an actor through his inattention, carelessness or perhaps for no explicable reason at all. The result is not a product of desire and is perforce accidental. Conversely, a consequence which is a result of plan, design or intent is commonly understood as not accidental.

*Fryman for Fryman v. Pilot Life Ins. Co.*, 704 S.W.2d 205, 206 (Ky. 1986).

Under the Kentucky Supreme Court's definition of "accidental," the COVID-19 pandemic is not "accidental." While it is "unfortunate," it is not a "consequence" of Plaintiff's behavior. That is, it did not "befall[]" Plaintiff as a result of its "inattention or carelessness." Rather, it befell Plaintiff because of the COVID-19 virus, an "explicable reason." The COVID-19 virus did what a virus does: it spread. And the "consequence" of its spread was part of the virus's "design." The Orders were likewise not "accidental." The Orders were "intent[ionally]" issued by Kentucky

9

Case 3:20-cv-00864-RGJ Document 37 Filed 09/27/21 Page 10 of 20 PageID #: 1284

officials to help slow the spread of COVID-19. Because neither COVID-19 nor the Orders were "accidental," Plaintiff has not plausibly alleged coverage under this provision.

But, even if COVID-19 and the Orders were "accidental," they did not cause "physical loss" or "physical damage."

Unlike the word "accidental," Kentucky appellate courts have not extensively examined the meaning of "physical loss" and "physical damage" in the context of an insurance policy. Nor has the Sixth Circuit when applying Kentucky law. *Cf. Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 575 (6th Cir. 2012) (applying Michigan law) ("[W]hile Universal certainly suffered a large inconvenience as a result of the mold and bacterial contamination of the Evergreen building, the damages resulting therefrom are not covered by the insurance policy issued by Federal. Universal did not suffer any tangible damage to physical property, nor were the Evergreen premises rendered uninhabitable or substantially unusable").

The parties cited ample non-binding precedent. [DE 11-1 at 159-60; DE 19 at 223-25]. Based on the Court's review of this precedent, district courts across the country have diverged in how they interpret "physical loss" and "physical damage" in insurance contracts. The majority of district courts, however, agree with Defendant. *See Bluegrass Oral Health Ctr., PLLC v. Cincinnati Ins. Co.*, No. 1:20-CV-00120-GNS, 2021 WL 1069038, at *4 (W.D. Ky. Mar. 18, 2021) (collecting cases).

In a recent opinion, so does the Sixth Circuit. In *Santo's Italian Café*, the Sixth Circuit considered whether "a pandemic-triggered government order, barring in-person dining at a restaurant, counts as 'direct physical loss of or damage to' the property." *Santo's Italian Cafe LLC v. Acuity Ins. Co.*, No. 21-3068, 2021 WL 4304607, at *2 (6th Cir. Sept. 22, 2021). The Sixth Circuit held that:

10

> Whether one sticks with the terms themselves (a 'direct physical loss of' property) or a thesaurus-rich paraphrase of them (an 'immediate' 'tangible' 'deprivation' of property), the conclusion is the same. The policy does not cover this loss. The restaurant has not been tangibly destroyed, whether in part or in full. And the owner has not been tangibly or concretely deprived of any of it. It still owns the restaurant and everything inside the space. And it can still put every square foot of the premises to use, even if not for in-person dining use.
>
> Think of the different potential sources of the restaurant's lost income—the virus and the State's shut-down orders—and whether either one created a "direct physical loss of or damage to" property. The novel coronavirus did not physically affect the property in the way, say, fire or water damage would. No one argues that the virus physically and directly altered the property. The restaurant indeed makes no such argument. The Governor's shut-down orders also did not create a direct physical loss of property or direct physical damage to it. They simply prohibited one use of the property—in-person dining—while permitting takeout dining and through it all did not remotely cause direct physical damage to the property. It was as if the government temporarily rezoned all restaurants in the State solely for takeout dining. Even as restaurant owners no doubt would suffer from such a decision and no doubt would have reason to object to it, the government regulation would not create a direct physical loss of property. A loss of use simply is not the same as a physical loss. It is one thing for the government to ban the use of a bike or a scooter on city sidewalks; it is quite another for someone to steal it.

*Id.* at 2-3.

Plaintiff alleges that COVID-19 and the Orders caused "accidental physical loss" or "accidental physical damage" to its property. [DE 1-2 at 9]. More specifically, Plaintiff alleges that the "presence of people infected with or carrying COVID-19 particles at premises renders the premises—including property located at the premises—unsafe, resulting in direct physical loss and/or physical damage to the premises and property." *Id.* at 15. In addition, Plaintiff alleges that as a result of the Orders "substantial portions of [Plaintiff's business] [had to] cease, thereby causing further substantial loss of Business Income." *Id.* at 18.

The Sixth Circuit in *Santo's Italian Café*[1] found similar arguments and allegations insufficient:

---

[1] The Court acknowledges that there are some differences between this case and *Santo's Italian Café*. First, the plaintiff in that case was a restaurant, not a "fun park." Second, the Sixth Circuit in *Santo's Italian Café*

11

> Santo's Café adds that 'loss' is a synonym for 'deprivation' and that it was deprived of its ability to use the premises for its intended purpose. It then points out that the closure orders have 'forced [it] to halt ordinary operations'; that the 'premises is unsafe, dangerous and unfit for its intended use'; and that Santo's Café 'cannot access' the restaurant 'for th[e] purpose' of 'dine-in operations.' R.1-1 at 3, 6. But this argument skates over the unrelenting imperative that the policy No. 21-3068 *Santo's Italian Café v. Acuity Ins. Co.* Page 9 covers only 'physical' losses. Ohio's prohibition on indoor dining no doubt caused an economic loss for Santo's Café. But it did not cause a direct, physical loss of property, which is a precondition for the business suspension coverage in the policy and in fact for most coverage in the policy.
>
> . . .
>
> Santo's Café has not alleged that its property is unusable or uninhabitable, only that it is "unsafe, dangerous and unfit for its intended use." R.1-1 at 6. One paragraph of the complaint, it is true, alleges that the orders closing the restaurant "prohibit [Santo's Café] and the public from having access to" the building. *Id.* at 4. But the theory is implausible, as it is inconsistent with the remainder of the complaint and above all with the text of the shut-down order itself.

2021 WL 4304607, at *5.

Based on these allegations and others in the Complaint, Plaintiff has failed to plausibly allege that COVID-19 and the Orders caused "accidental physical loss" or "accidental physical damage" to the covered property. *See id.*; *see also Ashland Hosp. Corp. v. Affiliated FM Ins. Co.*, No. CIV.A. 11-16-DLB-EBA, 2013 WL 4400516, at *1 (E.D. Ky. Aug. 14, 2013); *LexFit, LLC v. W. Bend Mut. Ins. Co.*, No. CV 5:20-413-DCR, 2021 WL 2382519, at *1 (E.D. Ky. June 10, 2021); *Bluegrass Oral Health Ctr., PLLC v. Cincinnati Ins. Co.*, No. 1:20-CV-00120-GNS, 2021 WL 1069038, at *4 (W.D. Ky. Mar. 18, 2021); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.,* 2 F.4th

---

applied Ohio, not Kentucky law. And third, the orders at issue in that case are not identical to those in this case. That said, like the Court here, the Sixth Circuit in *Santo's Italian Café* interprets the "common and ordinary meaning" of "physical loss" and "physical damage." *See Meridian Citizens Mut. Ins. Co. v. Horton*, No. CIVA5:08CV302 KKC, 2010 WL 1253084, at *5 (E.D. Ky. Mar. 25, 2010) (citation and quotation marks omitted) ("Where terms in insurance policies are undefined, Kentucky courts typically refer to dictionary definitions to give the terms their ordinary meaning as persons with the ordinary and usual understanding would construe them"). As a result, and despite these differences, *Santo's Italian Café* guides this Court's analysis.

1141, 1145 (8th Cir. 2021) ("Oral Surgeons did not allege any physical alteration of property. The complaint pleaded generally that Oral Surgeons suspended non-emergency procedures due to the COVID-19 pandemic and the related government-imposed restrictions. The complaint thus alleged no facts to show that it had suspended activities due to direct 'accidental physical loss or accidental physical damage,' regardless of the precise definitions of the terms 'loss' or 'damage'"); *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, No. 21-11046, 2021 WL 3870697, at *2 (11th Cir. Aug. 31, 2021) ("the COVID-19 pandemic and related shelter-in-place order" did not "cause direct 'accidental physical loss' or 'damage' to the dental practice's property").

To survive Defendant's motion to dismiss, Plaintiff presents a cascade of arguments. The Court has considered all of Plaintiff's arguments about this coverage provision, [DE 19 at 220-39], and none of them persuade the Court that Plaintiff is entitled to Business Income coverage due to its alleged losses. The Court discusses Plaintiff's primary arguments below.

Plaintiff first argues that *State Farm Fire and Cas. Ins. Co. v. Aulick*, 781 S.W.2d 531, 532 (Ky. App. 1989) should guide the Court's analysis of the meaning of the phrase "physical loss" and "physical damage." In *Aulick*, the Court considered whether the insurance policy "covered damages resulting from the delivery of heating oil to the residence of the insureds." *Id.* The oil delivery company used a truck to transport the heating oil and used a pump and hose attached to the truck's tank to funnel the oil into the insureds' home. *Id.* Unfortunately, something went wrong during the delivery process:

> [O]il escaped from the hose nozzle which was connected to the fill valve connected to the oil tank at the residence. Oil spilled on the ground and seeped into the basement of the house. An offensive odor permeated the residence, causing a loss of personal property.

*Id.*

The policy at issue in *Aulick* provided:

13

> SECTION 1—LOSSES INSURED
> Coverage B—Personal
> We insure for accidental direct physical loss to property described in Coverage B caused by the following perils ...:
> Seventeen specific perils follow including the one at issue here, # 6 "Vehicles."

*Id.*

On appeal, the insurance company argued that "the property loss suffered by the [insured] was not a 'direct physical loss' caused by a vehicle." *Id.* The Kentucky Court of Appeals disagreed:

> We do not find this argument at all persuasive as, of course, vehicles are frequently used to load and unload and deliver all sorts of material. In this case a vehicle brought the offending material to the appellees' home and the vehicle's motor was used to pump the material in such a way as to cause damage to appellees' property. The truck was being used exactly as it was designed and constructed to be used. Thus, under well-established principles of policy interpretation and notions of causation, we find no error in the trial court's legal conclusion that the damage was covered by the policy.

*Id.* at 533.

Plaintiff argues that *Aulick* stands for the proposition that "direct 'accidental physical loss' can be caused by something invisible, like an odor, which does not damage the structure of the property itself, but instead impacts the property derivatively—rendering it inaccessible, uninhabitable, unsalable, or unsuitable for its intended purpose." [DE 19 at 222]. *Aulick* does not determine the outcome here. First, while the Court recognizes that *Aulick* is still viable precedent, the Court notes that it has only been cited once in the last thirty-two years and not for the proposition advanced by Plaintiff. Second, the oil spill, which "seeped into the basement of the house," did in fact "damage the structure of the property itself." Removing the oil from the house would likely require more and take longer than the few sprays and seconds required to remove COVID-19 from surfaces using disinfectant. *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F.

Supp. 3d 878, 883–84 (S.D.W. Va. 2020) ("[E]ven when present, COVID-19 does not threaten the inanimate structures covered by property insurance policies, and its presence on surfaces can be eliminated with disinfectant . . . Because routine cleaning, perhaps performed with greater frequency and care, eliminates the virus on surfaces, there would be nothing for an insurer to cover, and a covered 'loss' is required to invoke the additional coverage for loss of business income under the Policy"). And third, because its analysis is primarily devoted to the meaning of the term "vehicle," *Aulick* provides, at best, a cursory analysis of the meaning of the phrase "accidental physical loss."

Plaintiff next argues that, even if the Court does not follow *Aulick*, Plaintiff's allegations fall under the dictionary definitions of "physical loss" and "physical damage." [DE 19 at 225]. Plaintiff asserts that "accidental physical loss" means "the inability to utilize or possess something in the real, material, or bodily world, resulting from a given cause without the intervention of other conditions." *Id.* at 226. "Accidental physical loss," therefore, "describes the scenario where a fortuity causes businessowners and their employees and customers to lose the full range of rights and advantages of using, accessing, or selling their *physical* business property. This is precisely the *loss* caused by COVID and the Civil Authority Order." *Id.* (emphasis in original). *Santo's Italian Café* did not adopt this interpretation. *See Santo's Italian Cafe*, 2021 WL 4304607, at *2-3. Nor does this Court.

Finally, Plaintiff asserts that Defendant's motion must be denied because: 1) Defendant's interpretation of "accidental physical loss" is "contradicted by the policy and larger industry context"; 2) its interpretation of the Policy is reasonable; and 3) it has plausibly alleged "physical alteration" of the property. [DE 19 at 230-39]. *Santo's Italian Café* addressed some of the arguments made in 1) and 2) and rejected them. *See Santo's Italian Café*, 2021 WL 4304607, at

15

*4-7. The remaining arguments made in 1) and 2) are unpersuasive. As to 3), Plaintiff has not plausibly alleged that COVID "causes physical damage to property." *See Kevin Barry Fine Art Assocs. v. Sentinel Ins. Co., Ltd.*, 513 F. Supp. 3d 1163, 1171 (N.D. Cal. 2021) ("The virus COVID-19 harms people, not property . . . KBFA does not, and could not plausibly, allege that its properties have been physically damaged by the virus causing its business losses"); *Pappy's Barber Shops, Inc. v. Farmers Grp., Inc.*, 491 F. Supp. 3d 738, 740 (S.D. Cal. 2020 ("Even assuming the truth of these allegations, the presence of the virus itself, or of individuals infected the virus, at Plaintiffs' business premises or elsewhere do not constitute direct physical losses of or damage to property"); *Uncork & Create LLC v. Cincinnati Ins. Co.*, 498 F. Supp. 3d 878, 884 (S.D.W. Va. 2020) ("Property, including the physical location of Uncork and Create, is not physically damaged or rendered unusable or uninhabitable . . . No repairs or remediation to the premises are necessary for its safe occupation in the event the virus is controlled and no longer poses a threat").

Having reviewed and considered Plaintiff's arguments, the Court finds that it is not entitled to Business Income coverage.

2. Civil Authority

The Policy provides Civil Authority coverage:

> When a Covered Cause of Loss causes direct damage to property other than Covered Property at the "premises", we will pay for the actual loss of "Business Income" you sustain caused by action of civil authority that prohibits access to the "premises", provided that both of the following apply:
>
> (1) Access to the area immediately surrounding the damaged property is prohibited by civil authority as a result of the damage; and (2) The action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or the action is taken to enable a civil authority to have unimpeded access to the damaged property.

16

[DE 19 at 239-40].

Plaintiff argues that "COVID causes physical damage to property, and it is transmitted via human contact with 'damaged' surfaces and items of property. Thus, when COVID was present in Louisville, local property had been directly damaged by COVID. That damaged property emitted a dangerous physical condition—an active, transmissible, deadly virus." *Id.* at 240. Defendant contends:

> The Civil Authority coverage requires both a government order prohibiting (not limiting) access to the insured premises and that the order arise from direct physical damage to property other than the insured premises. The orders involved here do neither.

[DE 22 at 445].

The Court agrees. Plaintiff has not plausibly alleged that other properties have suffered "direct damage" from COVID-19. *See Chelsea Ventures, LLC v. Cincinnati Ins. Co.*, No. 20-13002, 2021 WL 2529821, at *8 (E.D. Mich. June 21, 2021) ("But just as Chelsea was unable to establish that it sustained physical loss or damage to its property, the complaint fails to plausibly allege physical loss or damage to other property as a result of COVID-19").

Plaintiff has not plausibly alleged that the Orders "prohibit[ed] access" to the other property. "Prohibit[ed] access" is not defined in the Policy, so the Court turns to the dictionary definition of that phrase. *See Meridian Citizens Mut. Ins. Co.*, 2010 WL 1253084, at *5. "Prohibited" means "not permitted: forbidden by authority." *Prohibited*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/prohibited (last visited Sep. 27, 2021). Access means "permission, liberty, or ability to enter, approach, or pass to and from a place or to approach or communicate with a person or thing." *Access*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/access (last visited Sep. 27, 2021 "Prohibit[ed] access" means "not permitted" to "enter" the "described premises."

17

The Orders allowed Plaintiff's customers to use its facilities for some of activities Plaintiff offered. While it may be true that its customers could no longer play Laser Tag on the premises, nothing about the Orders as alleged in Plaintiff's Complaint prevented its customers from racing in the Go-Carts or playing a round of Mini-Golf. Plaintiff has failed to plausibly allege that it was prohibited from accessing its premises. *See Bluegrass*, 2021 WL 1069038 at *5 ("'Civil Authority' coverage sought by BOHC requires a claim for a tangible loss to property other than the insured property, which BOHC has failed to identify. Further, the Civil Authority coverage does not apply because there is no allegation that BOHC lost access to its business due to damage to surrounding property"); *see also B St. Grill & Bar LLC v. Cincinnati Ins. Co.*, No. CV-20-01326-PHX-SMB, 2021 WL 857361, at *6 (D. Ariz. Mar. 8, 2021) ("Plaintiffs have failed to allege any damage to property that is not the insured premises. Even if they had, Executive Order 2020-09 did not prohibit access to the insured premises, but merely stated that on-site dining was prohibited"); *Raymond H Nahmad DDS PA v. Hartford Cas. Ins. Co.*, 499 F. Supp. 3d 1178, 1188 (S.D. Fla. 2020) ("Plaintiffs do not allege that they were prohibited from accessing the premises nor do they allege that they could not perform medically necessary non-elective medical procedures. Merely restricting access to Plaintiffs' dental practice for essential medical services does not trigger coverage under the Policy's Civil Authority provision").

**C.    Remaining Motions**

After reviewing and considering the following motions, the Court **DENIES** Plaintiff's Motion for Oral Argument [DE 23], **GRANTS** Plaintiff's Motion For Leave to File a Sur-Reply [DE 25], **GRANTS** Defendant's Motions For Leave to File Supplemental Authority [DE 28; DE 29; DE 32], and **GRANTS** Plaintiff's Motions to File Supplemental Authority [DE 30; DE 31]. As to Plaintiff's First Motion For Judicial Notice [DE 35], Defendant does not "object to the Court

taking judicial notice of the existence of the materials Plaintiff submits." Hearing no objection, the Court **GRANTS** Plaintiff's First Motion for Judicial Notice. In this Motion, Plaintiff discusses and attaches a policy issued to another one of Defendant's insureds. *Id.* at 1117-19. The Court declines to consider the language in this policy because the Policy is not ambiguous and it is improper for the Court to consider "extrinsic evidence" in the "absence of ambiguity." *See Frear*, 103 S.W.3d at 106 ("In the absence of ambiguity a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence") (internal quotation marks, formatting, and citation omitted).

### III. CONCLUSION

Having thus considered the parties' filings and the applicable law, and being otherwise sufficiently advised, the Court **HEREBY ORDERS AS FOLLOWS**:

(1) The Court finds that the exercise of its jurisdiction over this declaratory judgment action under 28 U.S.C § 2201 is proper.

(2) The Court **GRANTS** Defendant's Motion to Dismiss [DE 11].

(3) The Court **DENIES** Plaintiffs Motion for Oral Argument [DE 23].

(4) The Court **GRANTS** Plaintiff's Motion For Leave to File a Sur-Reply [DE 25].

(5) The Court **GRANTS** Defendant's Motions For Leave to File Supplemental Authority [DE 28; DE 29; DE 32] and **GRANTS** Plaintiff's Motions to File Supplemental Authority [DE 30; DE 31].

(6) The Court **GRANTS** Plaintiff's First Motion for Judicial Notice [DE 35].

(7) This matter is **DISMISSED** with prejudice and **STRICKEN** from the Court's active docket.

(8) The Court will enter a separate Judgment.

*Rebecca Grady Jennings, District Judge*
*United States District Court*

September 27, 2021

20